**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | 26-44-SDD-SDJ |
| LAWERENCE JMOND GRAYER | |

**RULING**

Before the Court is the Motion to Dismiss Indictment filed by Lawrence Jmond Grayer ("Defendant").[1] The Government filed an Opposition,[2] to which Grayer replied.[3] Grayer also filed a supplemental memorandum in further support of the Motion.[4] For the reasons that follow, the Motion will be denied.

## I. BACKGROUND

This case arises from a federal grand jury Indictment[5] dated April 22, 2026, charging Grayer with a violation of 18 U.S.C. § 922(n), which makes it a crime "for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." The Indictment states that Grayer was "under a bill of information for a crime punishable by imprisonment for a term exceeding one year" when he received a firearm which had been shipped and transported in interstate commerce.[6] A Louisiana felony bill of information filed on May 6, 2025, charged Grayer with producing,

[1] Rec. Doc. 21.
[2] Rec. Doc. 26.
[3] Rec. Doc. 31.
[4] Rec. Doc. 36.
[5] Rec. Doc. 11.
[6] *Id.*

manufacturing, distributing, or possessing with intent to distribute tapentadol, a Schedule II controlled substance.[7] The charges remain pending.

Grayer moves to dismiss the Indictment, lodging an as-applied constitutional challenge to § 922(n).[8] He stresses the fact that the underlying charge supporting the § 922(n) case resulted from a bill of information rather than an indictment. Grayer argues that disarmament of an individual under these circumstances is not consistent with the historical tradition of firearm regulation in the United States, making the application of § 922(n) unconstitutional under the Second Amendment pursuant to the analysis articulated by the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*.[9] Grayer further argues that, under *United States v. Hemani*,[10] a federal prohibition from possessing firearms that attaches automatically—without the pre-deprivation procedural protections that founding era analogues required—fails the historical tradition inquiry.[11]

## II. LAW AND ANALYSIS

### A. Motion to Dismiss

Federal Rule of Criminal Procedure 12(b)(1) provides that "a party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Courts may resolve any defects before trial where, as here, the motion presents a question of law.[12]

---

[7] Rec. Doc. 26-3.
[8] Rec. Doc. 21.
[9] *New York State Rifle & Pistol Association, Inc. v.* Bruen, 597 U.S. 1 (2022).
[10] *United States v. Hemani*, 608 U.S. 772 (2026).
[11] Rec. Doc. No. 31.
[12] *See United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011).

## B. Discussion

### 1. Second Amendment Case Law

The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[13] In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court advanced a two-step framework for Second Amendment constitutional challenges.[14] The Court held:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[15]

Regarding the second step, "[t]his historical inquiry that courts must conduct will often involve reasoning by analogy[.]"[16] And "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"[17] This involves finding "a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."[18]

---

[13] U.S. CONST. amend. II.
[14] 597 U.S. at 24.
[15] *Id.* (citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 (1961)).
[16] *Id*. at 28.
[17] *Id*. at 28–29 (citing C. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)).
[18] *Id*. at 30.

In *United States v. Rahimi*, the Supreme Court further clarified the "historical analogue" requirement.[19] The Court explained that its recent Second Amendment cases "were not meant to suggest a law trapped in amber."[20] Rather, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."[21] The Court instructed that "[w]hy and how the regulation burdens the right are central to this inquiry."[22]

In *United States v. Quiroz*,[23] the Fifth Circuit applied the analysis set forth in *Bruen* and *Rahimi* to reject a facial challenge to § 922(n), which prohibits firearm possession by persons "under indictment". The court did not address the first step of the *Bruen* analysis but "assum[ed] arguendo that the plain text of the Second Amendment cover[ed]" the defendant and his conduct.[24] On *Bruen*'s second step the Court found that § 922(n) is consistent with the historical tradition of firearms regulation in this country. The court noted that "[o]ur nation has a long history of disarming criminal defendants facing serious charges pending trial."[25] As outlined in *Bruen* and *Rahimi*, the court examined both "why" and "how" the statute burdens the defendant's Second Amendment rights. With respect to the "why," the *Quiroz* panel found the purpose of § 922(n) — "protect[ing] the public from the danger of illegal firearm use by indictees"— relevantly similar to the historical purpose of pretrial detention, which included "preserv[ing] 'the safety of the people' from offenders awaiting trial."[26]

---

[19] *United States v. Rahimi*, 602 U.S. 680, 691 (2024).
[20] *Id.*
[21] *Id*. at 692.
[22] *Id.*
[23] *United States v.* Quiroz, 125 F.4th 713 (5th Cir. 2025).
[24] *Id.* at 717 (citing *United States v. Gore*, 118 F.4th 808, 812 (6th Cir. 2024)).
[25] *Id.* at 718.
[26] *See id.* (quoting Anthony Highmore, A Digest of the Doctrine of Bail in Civil and Criminal Cases vii (1783) (citing S. Rep. No. 90-1097, at 2197-98 (1968).The court noted that "[p]retrial detention resulted in the

Proceeding to the "how" metric, the court observed that § 922(n) "is a temporary restriction on an individual's Second Amendment rights when awaiting trial."[27] The statute's restrictions are limited both temporally and as to scope, as "they apply only to the period between indictment and trial" and "they do not bar the *possession* of weapons—only their shipment, transport, or receipt."[28] The court compared these restrictions to pretrial detention at the founding, which "was also a temporary restriction on the constitutional rights of those who posed a threat to society but had not been proven guilty."[29] Pretrial detention necessarily included the loss of an array of liberties, including access to weapons.[30] And although bail was commonly used to release individuals not charged with a capital offense prior to trial, "many modern-day felonies were historically capital offenses, meaning many modern-day indictees would historically have been detained prior to trial."[31] The court ultimately concluded that § 922(n) "'fits neatly' within our nation's historical tradition of protecting the public from criminal defendants indicted for serious offenses."[32]

### 2. As-Applied to Grayer: Whether *Quiroz* tradition reaches a person charged by Information

Beginning with step one of the *Bruen* analysis, the Court must determine whether the Second Amendment's plain text covers the individual's conduct.[33] The Government

complete deprivation of the criminal defendant's liberty and *ipso facto* restricted their access to weapons." *Id.*

[27] *Id.* at 719.

[28] *Id.*

[29] *Id.*

[30] *Id.* at 718-19. In this vein, the court noted: "In fact, because § 922(n) restricts only shipping, transporting, and receiving firearms, whereas pretrial detention denied the mere possession of firearms, it could be said that § 922(n) places a lesser burden on Second Amendment rights." *Id.* (citing *Gore*, 118 F.4th at 815).

[31] *Id.* at 719.

[32] *Id.* at 723–24 (quoting *Rahimi*, 602 U.S. at 698).

[33] *Bruen*, 597 U.S. 1 at 2.

argues that the Second Amendment is not implicated in this case because § 922(n) "does not implicate the right to 'have' arms or 'carry' them for protection; it merely restricts shipping, transporting, or receiving them."[34] Here, Grayer is alleged to have been in unlawful possession of a firearm. Laws making the possession of a firearm unlawful target the core of what the Second Amendment protects: firearm possession. Accordingly, step one of the *Bruen* analysis is satisfied, and the Court finds that the Second Amendment's plain text covers Grayer's conduct.

With respect to step two of the *Bruen* analysis, the focus of Grayer's argument is that he was charged by bill of information rather than indictment. Importantly, although the language of § 922(n) only mentions defendants "under indictment," the statutory definition of "indictment" "includes an indictment *or information* in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted."[35] Thus, the underlying Louisiana bill of information in this case meets the statutory definition of "indictment."[36]

Nonetheless, Grayer argues that the statute's "equation of an information with an indictment for federal-firearms-disability purposes" is "a modern creation with no founding-era pedigree."[37] Grayer acknowledges the holding in *Quiroz* but asserts that the "historical tradition *Quiroz* identified—pretrial detention of indicted capital defendants, with disarmament as its *ipso facto* consequence—operated entirely on charges the Fifth Amendment required to be initiated by grand jury indictment."[38] In other words, Grayer

[34] Rec. Doc. 26, pp. 7–8.
[35] 18 U.S.C. § 921(a)(14) (emphasis added).
[36] The Louisiana bill of information charges Grayer with violating Louisiana Revised Statute 40:967(A). The penalty for that offense includes imprisonment for a minimum of one year. La. R.S. 40:967(B)(1).
[37] Rec. Doc. 21-1, p. 4.
[38] *Id.* at p. 6.

argues that, "[b]ecause the Fifth Amendment foreclosed the founding generation from charging serious offenses by information, no founding era tradition of information-based pretrial disarmament could have emerged—and none did."[39] Thus, Grayer concludes that disarmament of an individual charged by bill of information is not supported by historical tradition because "no founding-era defendant could simultaneously be (a) charged by information and (b) subject to mandatory detention without bail. The category did not exist."[40]

The tradition identified by the *Quiroz* Court in upholding § 922(n) was the United States' "long history of disarming criminal defendants facing serious charges pending trial."[41] The Court finds no support in *Quiroz* for the argument that this rationale is affected by the instrument by which a modern-day defendant is charged. Grayer argues that a Louisiana bill of information cannot justify disarmament under *Bruen*'s second step because individuals could not be charged with capital offenses (resulting in mandatory detention without bail) by information in the founding era. But the Government does not need to produce a historical twin to justify the regulation. In describing the historical tradition of pretrial detention, the *Quiroz* court spoke of "criminal defendants" in general:

> Since the founding, the government has subjected criminal defendants to temporary restrictions on their liberty, including restrictions that affected their ability to keep and bear arms. During the founding era, the government was empowered to detain criminal defendants charged with serious crimes while they awaited trial. Pretrial detention resulted in the complete deprivation of the criminal defendant's liberty and *ipso facto* restricted their access to weapons.[42]

---

[39] *Id.* at p. 7.
[40] *Id.* at p. 12.
[41] *Quiroz*, 125 F.4th at 718.
[42] *Id.* (citations omitted).

The court described the modern purpose of § 922(n) as protecting the public from illegal firearm use "by indictees," but as the Government points out and as mentioned above, the statutory definition of "indictment" specifically includes informations.[43] Considering the definition of indictment in 18 USC § 921(a)(14), the Court concludes that the *Quiroz* Court's analysis of temporary disarmament applies equally to persons charged with felonies by Bill of Information.

The Fifth Circuit's subsequent opinion in *United States v. Kimble*[44] provides further support for the Government's position on the "why" prong of the *Bruen* historical analysis. There, the court considered the constitutionality of 18 U.S.C. § 922(g)(1), which prohibits possession of firearms by convicted felons, as applied to a defendant with two felony drug-trafficking convictions. The court upheld the conviction, holding that § 922(g)(1)'s lifetime disarmament "is constitutional as applied to defendants with predicate felonies for drug-trafficking offenses because of the intrinsic violence of the drug trade."[45] The holding was supported by the nation's historical "tradition of disarming those whose past criminal conduct evinces a special danger of misusing firearms," and the fact that a defendant's record of drug trafficking "underscores that he is the sort of dangerous individual that legislatures have long disarmed."[46] The court recognized "that drugs and guns are a dangerous combination," highlighting the "inherent violence" of the drug trade.[47] Thus, the

---

[43] 18 U.S.C. § 921(a)(14).
[44] *United States v. Kimble*, 142 F.4th 308 (5th Cir. 2025).
[45] *Id.* at 312.
[46] *Id.* at 314.
[47] *Id.* at 316–17 (quoting *Smith v. United States*, 508 U.S. 223, 240 (1993); *United States v. Yanez Sosa*, 513 F.3d 194, 202 (5th Cir. 2008)).

court concluded that "Congress can categorically disarm individuals convicted of violent felonies like drug trafficking," which is "an inherently dangerous activity."[48]

Taken together, *Quiroz* and *Kimble* support the constitutionality of § 922(n) as applied to Grayer. The historical tradition identified in *Quiroz*—temporarily "disarming criminal defendants facing serious charges pending trial"[49]—is directly applicable to Grayer, who faces felony drug-trafficking charges. Grayer provides insufficient support for the argument that a Louisiana felony bill of information should be treated differently than a grand jury indictment in the context of this historical comparison. As the Government puts it, "[t]he fact that charging *procedures* have changed since the founding era does not mean that the *principles* underlying pretrial detention have changed."[50] Although informations were historically reserved for misdemeanors as opposed to more serious offenses,[51] that is not the case today—a state felony bill of information is no less a legitimate charge than a grand jury's indictment.[52] It follows that the temporary disarmament of a defendant charged with a felony, whether by information or grand jury indictment, is sufficiently analogous to the historical tradition of pretrial detention of those charged with serious crimes. Further, *Kimble* supports the conclusion that drug trafficking[53] is the type of underlying charge that supports disarmament because of its inherently dangerous nature. Although *Kimble* dealt with convictions rather than charges,

---

[48] *Id.* at 317–18. The court also made clear that "[t]hat conclusion does not depend on an individualized assessment that [the individual] is dangerous." *Id.* at 318.
[49] *Quiroz*, 125 F.4th at 718.
[50] Rec. Doc. 26, p. 15.
[51] 4 William Blackstone, *Commentaries on the Laws of England*, Book IV, ch. 23 (1769); R. Justin Miller, *Informations or Indictments in Felony Cases*, 8 Minn. L. Rev 379 (1923-1924).
[52] The United States Constitution "does not require the States to observe the Fifth Amendment's provision for presentment or indictment by a grand jury." *Alexander v. Louisiana*, 405 U.S. 625, 633 (1972). *See also Hurtado v. California*, 110 U.S. 516, 538 (1884).
[53] In this case, possession with intent to distribute Schedule II Controlled Dangerous Substance.

the reasoning is directly analogous. Under *Kimble*, § 922(g)(1)'s *permanent* disarmament of an individual convicted of drug trafficking passes constitutional muster; in this case, 922(n)'s *temporary* disarmament of an individual awaiting trial on felony drug-trafficking charges is permissible.

By requiring "sufficiently similar" historical analogues as opposed to "dead ringer[s]," the Supreme Court recognized that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791."[54] Grayer in this case is "facing serious charges" through an underlying felony bill of information.[55] Although the mechanisms by which modern-day defendants may be charged with certain crimes are not identical to the mechanisms used in the founding era, the principles supporting disarmament of defendants awaiting trial remain the same. Thus, prohibiting an individual from possessing a firearm due to felony drug-trafficking charges brought by bill of information is sufficiently similar to the historical pretrial detention of individuals accused of serious crimes.

### 3. Pre-Deprivation Procedural Protection that the Second Amendment, *Rahimi*, and *Hemani* Require

Grayer relies on the Supreme Court's recent decision in *United States v. Hemani*,[56] arguing a federal firearm regulation that attaches automatically—without the pre-deprivation procedural protections that founding era analogues require—fails the historical-tradition inquiry.[57] Specifically, Grayer argues that in his case, the state court

[54] *Bruen*, 597 U.S. 1 at 30; *Rahimi*, 602 U.S. at 691–92.
[55] *Quiroz*, 125 F.4th at 718.
[56] Grayer submitted a new argument within his Response based on *Hemani*, which was published by the Supreme Court the day after the Government submitted its Reply. Rec. Doc. No. 31. Grayer then submitted a Supplement to his Response with supporting evidence: a transcript from his hearing in the Nineteenth Judicial District. Rec. Doc. No. 36.
[57] Rec. Doc. 31.

did not make a probable cause finding of dangerousness on the record. Thus, Grayer did not receive the requisite pre-deprivation procedural protections that he argues are required by the Second Amendment per *Rahimi* and *Hemani*.[58]

Grayer claims that there was no individualized judicial finding that he poses a credible threat to any identified person.[59] As such, he challenges whether the federal government can attach a federal firearm prohibition to a defendant whose only judicial process was an information that does not determine whether Grayer posed any credible threat and an initial appearance proceeding.[60] He acknowledges the initial appearance proceeding consisted of the commissioner advising him of the charges against him and his constitutional rights, setting bail, and imposing "standard-form pretrial conditions."[61] Specifically, the state court commissioner advised Grayer that:

> Total bail obligation is $30,000. Special conditions are random drug screens for a period of 120 days, bail supervision through a court approved monitor for an initial period of 120 days, GPS device because I'm ordering that you to be placed on house arrest for an initial period of 120 days. You are not to leave your place of residence except to attend court, school, work, or appointments-- and no firearms.[62]

Grayer contends that his initial appearance in state court was devoid of any credible threat-finding proceeding, which he argues is required before he can be deprived, even temporarily, of his constitutional right to bear arms. However, caselaw does not support the argument that the Second Amendment requires a pre-deprivation hearing in temporary disarmament circumstances. In *Hemani*, the Court recognized that historical habitual drunkard laws usually provided a pre-deprivation proceeding to determine if

[58] *Id*.
[59] *Id*. at 15.
[60] *Id*.
[61] *Id*.
[62] Rec. Doc. No. 36-1, pp. 3-4.

someone was truly incapacitated, whereas the modern day 18 USC § 922(g)(3) automatically disarms drug users without individualized credible-threat proceedings. Accordingly, the *Hemani* Court held that "affording the government that kind of 'broad power to designate any group as dangerous and thereby disqualify its members from having a gun' would risk allowing it to 'quickly swallow' the Second Amendment."[63]

*Hemani*'s holding is that in § 922(g)(3)[64] cases, there must be an individualized credible threat finding prior to temporary disarmament. The Court declined to categorize medical marijuana as categorically dangerous because doing so posed potential to afford the government power to designate groups as dangerous at its own discretion, a broad power it was not intending to grant the government.[65] The *Hemani* Court acknowledged that sometimes "an individual's unlawful use of marijuana (or any other controlled substance) may render him a danger to others," but nonetheless declined to categorically deem marijuana users as a whole to be categorically dangerous.[66]

The defendant in *Hemani* was charged under § 922(g)(3), which prohibits "an unlawful user of or addicted to any controlled substance" to possess or receive any firearm or ammunition that has been shipped or transported in interstate commerce.[67] This differs from the case at hand, where Grayer was indicted under § 922(n) for possession of a firearm while under a bill of information for Intent to Distribute a Schedule

---

[63] *Hemani*, 608 U.S. at 793 (citing Justice Barrett's dissenting opinion in *Kanter v. Barr*, 919 F.3d 437, 465 (2019)).

[64] § 922(g)(3) provides it shall be unlawful for any person "who is an unlawful user of or addicted to any controlled substance to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition, or to receive any firearm or ammunition which has been shipped or transported in interstate commerce."

[65] *Hemani*, 608 U.S. at 793.

[66] *Id*.

[67] 18 U.S.C. § 922(g)(3)

II Controlled Dangerous Substance.[68] An intent to distribute charge differs from an unlawful user of a controlled substance charge. The Fifth Circuit has consistently held that drug trafficking is an inherently dangerous activity due to the intrinsic violence of drug trade.[69] Furthermore, the Fifth Circuit and Supreme Court have both adhered to the principle that drugs and guns are a dangerous combination.[70]

In this case, the Nineteenth Judicial District charged Grayer pursuant to a bill of information for a crime on May 6, 2025, and he was subsequently indicted on October 7, 2025, under § 922(n) for possession of a firearm while under indictment. Grayer argues that, although he was under a bill of information, he did not have a requisite proceeding—after being charged with Possession with Intent to Distribute Schedule II Controlled Dangerous Substance and Possession of a Schedule II drug—to determine he posed a credible threat to himself or others.[71] But such a hearing is not required as applied to Grayer under *Hemani*.

Grayer was instructed by the commissioner during his initial appearance for the charge of Possession with the Intent to Distribute "No firearms."[72] He was then subsequently indicted for the crime of possession of a firearm while under indictment (for intent to distribute).[73] Grayer was under indictment for a crime that courts have consistently determined to be inherently dangerous. There is a difference in instances where a defendant is a recreational drug user and has not been adjudicated to pose a

---

[68] Rec. Doc. No. 11.
[69] *See United States v. Mancilla*, 155 F.4th 449, 452 (5th Cir. 2025); *United States v. Squire*, 177 F.4th 614, 619 (5th Cir. 2025); *Kimble*, 142 F.4th at 316-17.
[70] *Kimble*, 142 F.4th at 316; *Smith v. United States*, 508 U.S. 223 (1993); *United States v. Yanez Sosa*, 513 F.3d 194, 202 (5th Cir. 2008).
[71] Rec. Doc. No. 31.
[72] Rec. Doc. No. 36-1, p. 4.
[73] As established above, indictment and information are used interchangeably.

credible threat to others and a charge of intended drug distribution, which courts have uniformly found to be inherently dangerous.

The Court finds *Hemani* distinguishable. "[I]t is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another."[74] Unlike *Hemaini,* here, Grayer was charged with a dangerous crime, thus making the application of § 922(n) to him a constitutional application. Accordingly, the *Hemani* framework as applied to this Defendant is not an unconstitutional application of § 922(n) because this Defendant is facing charges for a crime that has uniformly and broadly been determined to be inherently dangerous.

## III. CONCLUSION

For the foregoing reasons, Grayer's *Motion to Dismiss*[75] is DENIED.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 15th day of October, 2026.

Shelly D. Dick

**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

[74] *See Nathan v. Alamo Heights Independent School District*, 173 F.4th 576, 613 (5th Cir. 2026) (Oldham, J., concurring); *United States v. Texas*, 97 F.4th 268, 313 (5th Cir. 2024) (Oldham, J., dissenting).
[75] Rec. Doc. No. 17.